```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4  UNITED STATES OF AMERICA,   )
                                )
 5                              )
                                )
 6             Plaintiff,       )
                                )
 7  vs.                         )        CASE NO. 10-CR-116-BDB
                                )
 8                              )
    HAROLD R. WELLS,            )
 9  NIC DEBRUIN,                )
    ERNEST BRUCE BONHAM,        )
10                              )
               Defendants.      )
11

12

13

14              TRANSCRIPT OF PROCEEDINGS
                     MAY 31, 2011
15       BEFORE THE HONORABLE BRUCE D. BLACK, DISTRICT JUDGE
                     PRETRIAL HEARING
16

17  APPEARANCES:

18

19  For the Plaintiff:          MS. JANE DUKE
                                MR. PATRICK HARRIS
20                              MS. PATRICIA HARRIS
                                U.S. Attorney's Office
21                              P.O. Box 1229
                                Little Rock, AR  72203
22
    For Defendant Wells:        MR. WARREN GOTCHER
23                              Gotcher & Belote
                                P.O. Box 160
24                              McAlester, OK  74502

25
```

```
 1   APPEARANCES CONTINUED

 2

 3   For Defendant Debruin:          MS. SHANNON MCMURRAY
                                     Shannon McMurray Law Office
 4                                   2642 E. 21st St., Ste 190
                                     Tulsa, OK  74114
 5
     For Defendant Bonham:           MR. WILLIAM LUNN
 6                                   Attorney at Law
                                     320 S. Boston, Ste 1801
 7                                   Tulsa, OK  74103

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1

2  MAY 31, 2011:

3          THE COURT:  The court will be on the record in the

4  matter of the United States v. Harold Wells, Nic DeBruin,

5  Ernest Bruce Bonham, 10-CR-116.  Counsel, please enter your

6  appearances.

7          MS. DUKE:  Jane Duke for the United States.

8          MS. HARRIS:  Patricia Harris for the United States.

9          MR. HARRIS:  Pat Harris for the United States.

10          MR. GOTCHER:  Warren Gotcher appearing for Mr. Wells,

11  and Mr. Wells appears in person, Your Honor.

12          MS. MCMURRAY:  Shannon McMurray for Mr. DeBruin.

13  Mr. DeBruin is here in court today.

14          MR. LUNN:  William D. Lunn for Mr. Bonham, who's

15  here.

16          THE COURT:  The first matter we need to take up is we

17  have a note from a juror.  Is the juror present?

18          JUROR GRIFFIN:  Yes.

19          THE COURT:  Your are Janice Griffin?

20          JUROR GRIFFIN:  Yes, sir.

21          THE COURT:  The note says, "The children in the

22  hallway are with me.  I was appointed by Judge David Gamble of

23  Osage County Court as visitation supervisor.  They are not

24  supposed to be out of my presence until June 27.  They will

25  have to be here as long as I am here."  Signed by Janice

1   Griffin.

2          Government wish to be heard?

3          MS. DUKE:  No, Your Honor.

4          MR. GOTCHER:  No, sir, Your Honor.

5          MS. MCMURRAY:  No, Your Honor.

6          MR. LUNN:  No, Your Honor.

7          THE COURT:  All right.  You'll be excused,

8   Ms. Griffin.

9          Do we have other matters to take up prior to bringing

10  in the panel for voir dire?  And we'll talk a little bit about

11  how we're going to do that once we've taken up any other

12  matters we need to take up.  Anything from the government?

13         MS. DUKE:  Your Honor, there are a number of pending

14  motions.  I don't know if the court's preference is to take

15  those up before voir dire or before the opening statements.

16         THE COURT:  All right, let's begin.  Does the

17  government have pending motions?

18         MS. DUKE:  Your Honor, I don't believe there are any

19  pending motions by the government.  I think the bulk of the

20  motions are filed by the defense.  There are some 404(b)

21  notices pending that are subject to dispute.

22         THE COURT:  Those will probably be taken up as we

23  proceed with the evidence, but let's proceed with the defense

24  motions first.  Mr. Gotcher.

25         MR. GOTCHER:  Your Honor, I think -- I briefed all

1    the motions.  I could stand on those or I can go over them if

2    you want me to.

3            THE COURT:  Let's just go over them.  I'll give you a

4    ruling as we go.

5            MR. GOTCHER:  I think the first one was on the

6    404(b), information that they had that I don't think was

7    entirely accurate on what they put out, according to the

8    discovery.  And so I did not think that it arose to a crime at

9    that point, as I think I sat out in my motion.  That had to do

10   with a alleged J.J. Gray taking some dope, giving it to another

11   person to sell.  He indicated that Mr. Wells thought that the

12   dope was going to be taken to be put back into a sting

13   operation to get a Mexican dealer.  The Mexican dealer at that

14   point, due to some changes in the laws, left the state -- left

15   the country, I think.  And at that point, Mr. Gray then took

16   the dope to a informant of his and had it sold.

17           In all fairness, Your Honor, they did say that

18   Mr. Gray did tell Mr. Wells that, but there's no date and time

19   on that.  And I believe any explanation occurred after the

20   government's investigation, Mr. Gray was cooperating.  So I

21   would think, Your Honor, that that would not fall within 404(b)

22   since it was not a crime.  It was set up for a sting

23   operation.

24           Then I think, Your Honor, there was a motion in

25   limine that we filed concerning the Jerry Clyde Stevenson

1  matter.  I'm not sure you ruled on that.  That had to do with

2  bias, we thought we should really get into it on bias of J.J.

3  Gray.  Obviously it depends upon the testimony, but I think it

4  does rise to bias because --

5         THE COURT:  Outline that for me a little bit

6  further.  What are you talking about?  Is this the robberies?

7         MR. GOTCHER:  Yes, sir, this is the robbery stuff.

8         THE COURT:  Do you have some conviction or some

9  evidence to prove that?  We're not going to have a separate

10  trial to determine whether J.J. Gray was involved in that.

11         MR. GOTCHER:  Your Honor, I think extrinsic evidence

12  can be used to show bias, and I think we do have some

13  witnesses --

14         THE COURT:  Well, there isn't any question about

15  that, but you don't have any extrinsic evidence.  I'll let you

16  ask one question.  If he denies it, then that's going to be the

17  end of that under extrinsic evidence.  You're also familiar

18  with that rule, I assume.

19         MR. GOTCHER:  Impeachment on collateral issue, yes,

20  sir.

21         THE COURT:  Yes, sir.  It's not a collateral issue

22  unless you have some proof of conviction or something else

23  that's coming in under 608.

24         MR. GOTCHER:  Okay.

25         THE COURT:  I think I said that last time, but go

1  ahead.

2          MR. GOTCHER:  I believe that was the only ones I had,

3  Your Honor, that were pending.

4          THE COURT:  Ms. McMurray, do you have any motions you

5  wish to take up before we bring in the jury?

6          MS. MCMURRAY:  Mine also deals with a 404(b) notice

7  that was proffered by the government relating to some alleged

8  statements by Mr. DeBruin to, I think, Cal Kaiser stating that

9  on -- we don't know when, where or how this conversation

10  allegedly occurred, but that Nic DeBruin had personal knowledge

11  of Wells taking money for his own personal benefit.  And I've

12  outlined in the case law why I believe that's totally

13  inappropriate under 404(b), and ask that they not be allowed to

14  bring that in.

15          THE COURT:  Can you find out when, where and what was

16  said on cross-examination?

17          MS. MCMURRAY:  Probably not.  I mean, if he didn't

18  know it then, I don't know why he'd know it now.  That's the

19  point.  It's out there, and it's like unringing a bell.

20  It's --

21          THE COURT:  Are you saying he has no knowledge of any

22  of these factors?  He doesn't know when it happened or who was

23  there or what was said or -- doesn't sound like it's going to

24  come in in that case.  There's really nothing to testify about.

25          MS. MCMURRAY:  Well, that's my point, Judge.  He

1    doesn't -- in his interviews with the government, he just says,

2    Nic DeBruin told me of personal knowledge of Wells stealing

3    money.  And he gives no facts, no specifics how it occurred,

4    when it occurred, when specifically Nic knew this.  And beyond

5    that --

6            THE COURT:  So you're not saying you can't cover it

7    on cross-examination; you're just saying that at this point,

8    you don't know what the answer is?  He doesn't make any

9    representations he has no knowledge of any of these things?

10           MS. MCMURRAY:  Other than just the conclusion that

11   this occurred.  And further, Judge, I don't think it rises to

12   the level of 404(b) information.  It's not evidence of a crime,

13   and it's improper.

14           THE COURT:  It certainly would seem to go to

15   conspiracy in this matter.

16           MS. MCMURRAY:  I'll stand on the motion in that it's

17   improper.

18           THE COURT:  I'm inclined to admit it at this point.

19   We'll see how the evidence develops, but I have to say at this

20   point, based on what I've heard, it seems likely it will come

21   in.

22           MS. MCMURRAY:  Judge, additionally, I just filed a

23   response to the government's request for in limine regarding

24   J.J. Gray's involvement with the Jerry Clyde Stevenson burglary

25   ring.  I think there's ample evidence that the court and the

1  jury should hear about his involvement and the scope and depth

2  of his criminal activities that --

3           THE COURT:  What do you have that you are going to

4  prove that with?

5           MS. MCMURRAY:  Well, I have --

6           THE COURT:  Articles from the Tulsa World?

7           MS. MCMURRAY:  Pardon me?

8           THE COURT:  What do you have that you're going to

9  prove that with?

10          MS. MCMURRAY:  Well, I have -- more importantly, I

11  have that the government declined to investigate or allow

12  investigation, and I think that's important for the jury to

13  know.

14          THE COURT:  How are you going to prove that?

15          MS. MCMURRAY:  I have officers that will come in and

16  testify that they took this information to the government and

17  it was made very clear --

18          THE COURT:  You don't know whether they've

19  investigated it or not, do you?

20          MS. MCMURRAY:  Who?

21          THE COURT:  The government.

22          MS. MCMURRAY:  They said they haven't in their

23  motion.  They said that the responsibility to investigate J.J.

24  Gray lies at the feet of the U.S. Attorneys's Office for the

25  Northern District of Oklahoma or the Tulsa County District

1   Attorney's Office.

2          THE COURT:  Well, you really wouldn't expect the

3   Eastern District of Arkansas to be investigating that, would

4   you?

5          MS. MCMURRAY:  Well, they're investigating the public

6   corruption case, Your Honor, so, yes, I would.

7          THE COURT:  Well, in any event, that's clearly a

8   collateral matter, and you have no proof it's going to persuade

9   the jury.  Clearly if you have a conviction or admission, then

10  I'd be willing to consider it.  Otherwise, I don't see it

11  coming in.

12         MS. MCMURRAY:  Well, Judge, just for the record, I

13  think there's case law that states that failure of a defense

14  counsel to look into and reach out and advise the jury or

15  expose to the jury tacit plea agreements is error.  And --

16         THE COURT:  What do you have to show there's a tacit

17  plea agreement?

18         MS. MCMURRAY:  Well, Judge, I think that there's

19  going to be ample evidence of continuing looking the other way

20  by the government on crimes that J.J. Gray has committed.  Now,

21  that's done either in a tacit plea agreement or they don't want

22  to know or they want to preserve the integrity and what

23  credibility J.J. Gray has.  If he comes in here and says, I did

24  this little bit, but I didn't do this, and the jury thinks

25  that, well, he must be telling the truth, when we can't go into

1  these things that he didn't disclose in his 302s but we can

2  prove through other evidence, I think it's very important that

3  the jury know these things.  And I think the case law supports

4  that the jury is entitled to know of these other crimes that

5  the government isn't looking into, that isn't reporting, and it

6  would -- it would affect my believability of J.J. Gray if I

7  were sitting on the jury.

8          THE COURT:  If you had evidence of it that was

9  conclusive, I agree, it would, but I'm not going to try that

10  case within this case.  We have plenty to say grace over here.

11  We're not going to be trying two cases within this trial.

12          MS. MCMURRAY:  I'm not asking to try two cases.

13          THE COURT:  It sounds like you are.  You're trying to

14  prove J.J. Gray was involved in all these other things, and we

15  have no conclusive proof of that, so then the government has to

16  rebut it and then we're trying a second case.  I'm not going to

17  do that.

18          MS. MCMURRAY:  I think the more important part of it

19  is the fact that the government said, I don't want to hear

20  about that case.  We don't want to --

21          THE COURT:  If you've got some evidence that says

22  that it's clear that the government says, we don't want to know

23  anything about this, we're going to look the other way, then

24  you can bring that up.

25          MS. MCMURRAY:  That's what I'm asking to do, Judge.

1        THE COURT:  We'll see who that is and how it comes

2   up.

3        MS. MCMURRAY:  Thank you.  And then I had just joined

4   in a couple of motions with Mr. Lunn regarding the audio and

5   video, but I'll let him --

6        THE COURT:  I think I've already ruled on that, but

7   I'll hear from Mr. Lunn again.

8        Mr. Gotcher.

9        MR. GOTCHER:  Can I take the podium for one second?

10       THE COURT:  Yes.

11       MR. GOTCHER:  She did remind me I did have one other

12  motion in there, Your Honor, it had to do with the same

13  statement of Nic DeBruin saying that Mr. Wells had taken

14  money.  Obviously it's not coconspirator hearsay because it was

15  not during any course of any conspiracy, they haven't alleged

16  that.  It's hearsay as to H.R. Wells.  If it comes in, we would

17  ask for a severance.

18       Even the government recognizes that there's a

19  problem, because in a footnote to their 404(b), they

20  acknowledge that they would Brutonize it and take out any name

21  of H.R. Wells.  We would object to it and move for a limine in

22  that.

23       THE COURT:  I don't understand Bruton in that

24  context, but I'll likely admit it.  Mr. Lunn.

25       MR. LUNN:  Judge, the government in this case has

1   filed three 404(b) notices.  The first ones involve --

2   actually, the first two involve instances where the Roberts

3   case very likely comes into play, and I've cited that case for

4   the court.  It's basically where the government just simply has

5   indicated that something has happened.  In the first instance,

6   it has to do with some type of stealing going on during the

7   course of the search warrant execution.  But it fails to give

8   any information about what parties are involved in the search

9   warrant execution, any specific address, any specific date,

10  anything.

11          So as a result, I find myself in a situation of

12  looking through 65,000 pages of discovery trying to guess which

13  search warrant execution we might be dealing with.  And for

14  that matter, it might not even be a search warrant execution;

15  it could be a knock and talk.  It could be anything.

16          THE COURT:  Did you make any attempt to send an

17  interrogatory or to find this in any way?

18          MR. LUNN:  I filed a motion, obviously, and there

19  hasn't been any real response to it.  The government hasn't

20  done anything to elaborate as to where that might have been.

21          Now, I obviously -- I can make guesses, but I don't

22  want to get into trial and have made the wrong guess about

23  possibly which search warrant execution we're looking at.

24          The other cases -- the other situation, which is

25  their second 404(b) notice, is even more general than that;

1  it's just that they knew that supposedly Wells was stealing or

2  committing crimes during the course of -- and that they don't

3  give any specifics as to what crimes or where or anything of

4  that nature.  It's very, very similar to the Roberts case,

5  which just basically involves the idea that there were some

6  type of -- that other women had been involved in -- as victims

7  in certain incidences.  So --

8         THE COURT:  How does that reflect on your client, if

9  it deals with Mr. Wells?

10         MR. LUNN:  Well, the idea is that he is in a broad

11  conspiracy with Mr. Wells and he knows that he's committing

12  crimes, and so it's no surprise to him that there's crimes

13  going on at any point when he's associated with him.  So that

14  would be the problem.

15         So based on -- we feel that based on the Roberts

16  case, that the government has provided insufficient information

17  for us to be able to respond appropriately for purposes of

18  trial.

19         The third 404(b) notice does involve actually

20  specific dates and times; however, there is some hearsay that's

21  involved with it where there's an effort made to claim that

22  Officer McFadden has said that he's aware of certain times when

23  Officer Henderson has provided money to Officer Bonham.

24         We think that's inappropriate.  Obviously if they

25  want to call Officer Henderson, I guess they could.  I think

```
1    that's highly unlikely, however.

2            THE COURT:  There may be some Constitutional issues

3    there.

4            MR. LUNN:  I think the most that we can just simply

5    say is to go back to a 403 analysis where we're getting into a

6    situation where obviously the court needs to consider

7    everything that's going on in the trial.  And you may very well

8    have a situation with Officer Bonham where the admission of

9    this type of evidence really outweighs, is more prejudicial to

10   Officer Bonham than anything else.

11           THE COURT:  Well, I can't make that decision at this

12   point.  I'll have to see how the evidence develops.

13           MR. LUNN:  Judge, there is two other matters.  One of

14   them is our motion to reconsider.  The first motion in limine

15   has to do with the concept of the Rule of Completeness.  As you

16   know, Judge, when we were last here, May the 2nd, we wanted to

17   have an opportunity to inspect the equipment and recordings so

18   that we could get proper forensic recordings done.

19           We were ultimately able to determine that there are

20   gaps in these tapes at critical points in time.  The gaps can

21   be based on one of two things, either the government has

22   deliberately redacted certain portions of that -- of those

23   tapes at given times, which seems to be very possible -- very

24   possibly what's happened --

25           THE COURT:  Does your expert have any evidence to
```

1  support that?

2           MR. LUNN:  To some extent, yes.  And that's part of

3  the reason what we gained from the inspection, and I provided

4  that in the motion to compel.  The key fob was operating

5  without any problems.  It had plenty of battery storage, there

6  wasn't any reason for it to have been suddenly discontinued.

7  And it indicates that it's --

8           THE COURT:  The government says they're not going to

9  use the key fob, and it doesn't seem to implicate your client

10  in any fashion that I can see.

11           MR. LUNN:  Well, our position is that the key fob as

12  well as the audiotape -- the key fob involves things that go on

13  in the motel room.  All of the audio recordings are linked

14  together.  The court should not take a position that it's okay

15  for the government to play just the videotape and just ignore

16  the audiotapes or to play just a portion of the audiotape in

17  the motel room, then not play other portions of the audiotapes

18  in the motel room, or to ignore a key fob which involves some

19  recordings that take place in the motel room and other

20  recordings that take place in the area where things are going

21  on.

22           And for -- and that all falls back into this concept

23  to the Rule of Completeness under 106 that in -- with the

24  concept of fairness, and I cited several cases to you, that the

25  court does have the ability to throw them all out if the

1   government can't provide a complete tape.

2           And in this case, that's exactly what's going on

3   here.  We have two really critical points in this case that we

4   believe would exonerate Bruce Bonham.  Certainly Bruce Bonham

5   asked to get the audios from the very moment that he knew there

6   was both audio and video recordings.  And it's the government

7   that, either through inadequate equipment, they're using Super

8   8 recording tapes and other antiquated equipment in the motel

9   room, they're using a slightly more advanced digital audio

10  system with the key fob.  There's an increased likelihood,

11  according to our expert, that the omissions were done by the

12  government and not by any other explanation.

13          That falls back again to a motion to compel which we

14  filed where we requested that the government provide us with

15  the FBI notes from the motel room.  I've never been in an audio

16  surveillance or a video surveillance situation where there were

17  not fairly specific instructions for FBI officers in the

18  process of conducting --

19          THE COURT:  You filed that Friday, as I recall.

20          MR. LUNN:  Yes, but that was because I only got the

21  information from them just earlier in the week where we have

22  been able to get an inspection of the tapes.  And so we've been

23  asking for two and a half months to be able to get our

24  inspection, and at that point, we realized there was a genuine

25  issue as to --

1    THE COURT:  And your theory is that the instructions

2  say wherever there is exculpatory evidence deleted?

3    MR. LUNN:  I think what's going on here is that the

4  FBI agents have instructions that say whenever the consenting

5  party is outside of the presence of these officers, that you're

6  not supposed to be recording.

7    And so what you have with the key fob is you have Nic

8  DeBruin leaving the presence of one federal agent and suddenly

9  the recording stops, and then it recommences when he enters the

10  presence, going back into the motel room, of the second federal

11  agent.

12    THE COURT:  Okay, let's assume that's true.  What

13  would that prove?

14    MR. LUNN:  In our case, there's critical evidence

15  about Mr. DeBruin contacting the canine officer in this case,

16  talking with Officer Bonham, so there are matters that take

17  place during this gap that are critical to us for purposes of

18  being able to establish that Officer Bonham isn't doing

19  anything illegal.

20    THE COURT:  I understand that, if that's so, but if

21  the instructions are don't tape when the CI is not in the room,

22  how would that address incompleteness?  What would that show?

23  Some sinister motive?  That would show they agree with you

24  perhaps on the law, but not with the court.

25    MR. LUNN:  Well, you have a heightened situation of

1   unfairness that's taking place if the government is allowed to

2   play portions of either these video or audiotapes --

3            THE COURT:  Which is what I understand from your

4   brief you intend to do.

5            MR. LUNN:  -- when the consenting -- only if the

6   government is allowed to play portions of these audiotapes,

7   that's right.

8            THE COURT:  Then you're going to play other portions,

9   or you're going to play it all.

10            MR. LUNN:  I'll do that.  But our position is that

11   obviously they shouldn't be allowed to play any of it.

12            THE COURT:  I understand.

13            MR. LUNN:  So -- but if the government is allowed to

14   have the opportunity to play portions of these videotapes that

15   they think helps them prove their case, and they're able to

16   redact those portions or make impossible the recording of other

17   portions of the videotape that are exculpatory to my client,

18   then that's unfair.  And because of that unfairness, the court

19   should throw out all the tapes.

20            THE COURT:  I'm not going to do that, so I've ruled

21   on that.  I'll decline your motion to reconsider.

22            MR. LUNN:  What about the motion to compel?  Are we

23   able to get the FBI notes?

24            THE COURT:  I want to hear from the government, what

25   they have to say about that.

1          MR. LUNN:  Thank you.

2          THE COURT:  Ms. Duke.

3          MS. DUKE:  Thank you, Your Honor.  With respect to

4    these distinct and separate pieces of evidence, the key fob

5    device that Mr. Lunn keeps referring to is a self-contained

6    recorder.  It is a concealed device that records itself.  It is

7    within the control of the person who has possession of it.

8    Access on and off is controlled by pushing the buttons.  So

9    when there are gaps in that tape, it's because these defendants

10   and other officers are roaming around the parking lot clicking

11   the button.

12          With respect to that device, since it is a

13   self-contained recording device, there were no minimization

14   instructions regarding the key fob.  It recorded if it was

15   activated.

16          THE COURT:  Let's hear about the other materials.

17   Let me hear about the -- what I'm more interested in, frankly,

18   is the search warrant execution and the other crimes relating

19   to Mr. Wells.

20          MS. DUKE:  Mr. Harris is going to handle those,

21   Your Honor.

22          THE COURT:  All right.

23          MS. HARRIS:  As to the 404(b) stuff, Mr. Lunn says he

24   doesn't know what this is.  Every one of our responses -- I'm

25   talking about document 176, document 167, and document 166 --

1  are our responses.  Every one of them point out to him the

2  Bates numbers of where this material is.  He says he doesn't

3  know where this information is, he doesn't know anything

4  specific.

5          THE COURT:  Does that have some indication of when

6  this search occurred or what the parameters were?

7          MS. HARRIS:  It has as much as we know, yes, sir.  I

8  mean, we've given him everything we know.  Callison Kaiser is

9  going to testify that he was assisting on a TPD search in the

10 north side of Tulsa near Pine and Lewis, and he's going to talk

11 about that.  He's going to talk about that during the search,

12 an officer gave him some money, he thinks it was Jeff

13 Henderson, and he shared it and he did so, including sharing

14 some of the money with Bonham, Mr. Bonham.

15          McFadden is going to testify on June 12 -- going to

16 testify that on June 12, 2007, he, Henderson, Bonham and other

17 witnesses -- other officers were at the search of Isaias

18 Gonzalez's house at 4112 South 130th East Avenue, Apartment 510

19 in Tulsa, and he's going to testify about what happened there,

20 that Henderson took two to three pounds of meth and that

21 Mr. Bonham -- one of the officers said, You're taking too much,

22 and Mr. Bonham said, Who cares?  It's just some Mexican.  He

23 was present.

24          Then the third one is also another one of Callison

25 Kaiser.  And he's going to testify that he's aware that

1  Mr. Bonham stated that -- Mr. Bonham states that Harold Wells

2  was taking money for his own benefit.  And Mr. Kaiser can

3  testify to that.  That's going to be the testimony.  They can

4  cross-examine him.  And Mr. Kaiser will --

5          THE COURT:  All right.  Sounds fairly specific,

6  Mr. Lunn.

7          MR. LUNN:  Judge, I think a very critical

8  consideration with regard to the key fob, and for that matter

9  the audio equipment in the room, is that we expressly requested

10  the government to provide us that equipment so that we could

11  determine whether or not the key fob really turned on and off

12  and whether the -- that the audio equipment suddenly stopped

13  recording whenever --

14          THE COURT:  Well, it didn't suddenly stop.  Their

15  explanation is you knock the lamp shade or the alarm clock and

16  thereby knock the recording device.

17          MR. LUNN:  Well, that's fine.  That's their

18  explanation.  But we certainly had our forensic expert there

19  ready to determine whether their explanation made any sense,

20  and they refused to provide us any of that equipment.

21          THE COURT:  All right.

22          MR. LUNN:  So we can't confront them about their

23  explanation, and that's a problem.

24          THE COURT:  Now, your expert can testify to that?

25          MR. LUNN:  Yes.  He can certainly indicate that we

1  requested the equipment.  He can certainly testify that they

2  refused to provide it to him.

3          THE COURT:  All right.

4          Ms. Duke, are you refusing to provide it?  Because I

5  will let him testify to that.

6          MS. DUKE:  Your Honor, first, with respect to

7  Mr. Lunn's request, at no point has access to the equipment

8  been brought before this court by a motion filed by Mr. Lunn.

9  He has certainly requested it, but it is proprietary law

10  enforcement-sensitive devices that the Bureau does not disclose

11  the inner mechanisms of, for very obvious reasons.

12          Mr. Lunn attended the inspection of the original

13  recordings which this court directed.  His expert was there.

14  Ms. Trisha Harris for the government was there.  During the

15  course of that inspection, the expert stated to Ms. Harris that

16  he understood what happened with respect to those wireless

17  devices in the room after looking at this.

18          And point of fact, Your Honor, Mr. Lunn, who made

19  such an issue about the United States not producing a byte --

20  forensic byte stream image of the audio and video from the

21  motel room, when his expert got to the inspection, the expert

22  said, I don't need to duplicate those, I have what I already

23  need.

24          So they've had all this information to come up with

25  their analysis.  The analysis shows exactly what we've been

1    representing to the court and to the parties, that the devices,

2    because they were wireless, disconnected during the search

3    activities.  They are complete in that we will play them all

4    until they terminate.

5            And so, no, the devices themselves were not allowed

6    access.  Mr. Lunn was at that inspection.  He was not present

7    in the room.  The expert explained that he expected that that

8    would be the position of the United States, and nothing more

9    was made of it, Your Honor.

10           THE COURT:  Fair enough.  I think we're done with

11   that issue, Mr. Lunn.  We're going to allow it.  You can put

12   your expert on to say whatever he found or thought.

13           MR. LUNN:  Judge -- I understand the court's ruling.

14   I'm a little concerned about the statements made by Ms. Duke.

15   I was present --

16           THE COURT:  If your expert testifies as you've

17   represented, they're entitled to rebut that testimony with

18   anyone who was there who says your expert said, This is fine

19   with me.

20           MR. LUNN:  Okay.  And mind you, we did do additional

21   recording while we were there.  I was present at the time when

22   the government announced -- at the very, very first, within the

23   first five minutes, that they were not going to provide the

24   recording equipment.  And we had to simply accept that, even

25   though we specifically requested it.

```
 1              THE COURT:  Well, they are not going to.  And you can
 2   point that out to the jury.
 3              MR. LUNN:  With regard to the Callison Kaiser
 4   incident at Pine and Admiral sometime in 2007 --
 5              THE COURT:  Pine and Lewis, I believe.
 6              MR. LUNN:  That's the extent of what we know.  There
 7   are probably --
 8              THE COURT:  Does your client go to Pine and Lewis
 9   every week or is that a frequent occurrence?
10              MR. LUNN:  He's on the north side.  That address --
11              THE COURT:  And he was involved with Kaiser in more
12   than one search of that property?
13              MR. LUNN:  Absolutely.  There are dozens of searches
14   that have taken place.
15              THE COURT:  At that property?
16              MR. LUNN:  Well, we're not talking about a property
17   that's at Pine and Sheridan.  We're talking about a property
18   that's somewhere around there --
19              THE COURT:  A property at Pine and Lewis.
20              MR. LUNN:  We're talking about a property that's
21   somewhere around there, and the property has never been
22   identified.  The date has never been identified any more than
23   just simply 2007.  Jeff Henderson during 2007 probably was at
24   dozens of search warrant executions.  So it's impossible based
25   on the information that the government has provided us for us
```

 1   to determine what incident we're talking about.

 2           THE COURT:  I'll let you cover that on

 3   cross-examination.  Anything else?

 4           MR. LUNN:  No.

 5           THE COURT:  All right.  Anything else of legal

 6   substance before we begin talking about voir dire?  Ms. Harris.

 7           MS. HARRIS:  Yes, sir, Your Honor.  Just a couple of

 8   things.  Mr. Gotcher brought up some 404(b) information about

 9   Mr. Wells, and I can respond to that.

10           Essentially the evidence on Mr. Wells 404(b) is that

11   Mr. -- that ATF agent McFadden and Mr. Wells conducted a

12   traffic stop, it was in 2007.  They seized seven pounds of

13   marijuana.  The testimony will be that Mr. Wells maintained

14   custody of that marijuana at his residence for several days.

15   He then turned it over to Mr. Gray, gave it to Deb Clayton to

16   sell, Deb Clayton sold it and later gave Gray some of the

17   proceedings.

18           According to Mr. Gray, who offered the testimony,

19   Mr. Wells was aware that the marijuana was distributed by

20   Ms. Clayton.

21           So we -- it's our position that the information

22   contained in the 404(b) notice and in the discovery is adequate

23   to identify the information and is specific enough, and if

24   there is any concern about that, it can be dealt with on

25   cross-examination.

1          The final thing that I think the government wants to

2   bring up is a brief that we filed with regard to the admission

3   and/or use of transcripts of the audio recordings.  And it's

4   the government's position and desire to play along with the

5   audio recordings a transcript or show a transcript of those

6   recordings.  And that brief is filed in document 186,

7   Your Honor.  It sets forth Tenth Circuit law, all of which

8   upholds the use of transcripts.

9          Certainly the best-case scenario would be if the

10  defense and the prosecution agree on the substance of the

11  tapes.  That has not come to pass.  We have provided to the

12  defendants copies of the transcripts that we have prepared

13  based on review of the tapes by individuals who were listening

14  and/or participating in the conversations that are on those

15  tapes.

16         The Tenth Circuit has provided some options in the

17  event that the parties don't agree on what the tapes actually

18  say.  One of those options is to have the court review it and

19  make a determination about its accuracy.  Another is to have

20  the defense --

21         THE COURT:  I've not seen any objections as of this

22  point.  Is it your understanding there will be some?

23         MS. HARRIS:  It is my understanding based on

24  communications with defense counsel -- we have provided them --

25  they have not provided alternative transcripts that they think

```
 1    are accurate.  So it's our --

 2              THE COURT:  Do they have an alternative version?

 3              MS. HARRIS:  If they do, they haven't provided those

 4    to us.  So just wanted to bring --

 5              THE COURT:  Have they given you specifics as to what

 6    they think is inaccurate?

 7              MS. HARRIS:  No, Your Honor.

 8              THE COURT:  Who has got a problem with the

 9    transcripts?  Ms. McMurray?

10              MS. MCMURRAY:  Judge, I'd have to talk with the

11    government.  There's a few additions that I would want to make,

12    but by and large, I don't dispute, and would agree that that's

13    what the video says, but I'd like to have the entire video

14    transcribed.  They kind of stop it.  There's additional

15    conversations before the audio shuts off that I think should be

16    included.  And then there are a couple of additions --

17              THE COURT:  Why don't you take that up with the

18    government and see if you can resolve that.  If not, I'll make

19    a ruling.

20              MS. MCMURRAY:  Then they've got little balloons

21    outside where they tell the jury what's going on, and I do

22    object to those.  I think they can look at the video and don't

23    need the little pocket bubbles about what they believe is going

24    on.

25              THE COURT:  I assume those will not be included.
```

 1          MS. HARRIS:  Your Honor, that was just part of a

 2   brief that we filed.  The transcripts don't have any editorial

 3   comments.

 4          THE COURT:  All right.  All right.  Anything else

 5   before we start talking about voir dire?

 6          In the future, when I say 9:00, I mean 9:00 for the

 7   jury.  The lawyers will be here at 8:30 to take up any

 8   preliminary matters.

 9          MS. DUKE:  Yes, sir.  Your Honor, pursuant to the

10   court's trial notice, specifically on page 6, it directed that

11   10 working days before trial that the parties give notice of

12   any prior conviction evidence that would fall under the time

13   limits set forth in 609(b).  Some of the witnesses' convictions

14   for the government are outside that time limit.  We've received

15   no notice, so we would just request that defense counsel not

16   allude to those convictions outside of the 10-year limit for

17   witnesses Ryan Logsdon and Debra Clayton.

18          THE COURT:  All right.  Fair enough.  You tendered no

19   voir dire, Mr. Lunn.  You're not going to do voir dire.  Is

20   that my understanding?

21          MR. LUNN:  Judge, I haven't tendered any voir dire.

22          THE COURT:  I guess you're not going to do anything?

23          MR. LUNN:  I'm --

24          THE COURT:  Did you read the instructions?

25          MR. LUNN:  Well, I have.  I just understood basically

1   we've obviously had this written voir dire which pretty well

2   covered most everything that I would ordinary ask.  Usually

3   something comes up in the way of questions -- additional

4   information that comes up during the course of people answering

5   questions or what have you, and so whatever voir dire I would

6   have would most likely be more related to that.  So --

7           THE COURT:  Clear it with the government first.  If

8   they don't object, I don't have a problem with it.  If they do

9   then, you're out of luck.

10          Ms. McMurray, you tendered voir dire this morning.

11  Has the government had a chance to see that?

12          MS. MCMURRAY:  I think I did it Saturday or Sunday,

13  Judge.

14          THE COURT:  Well --

15          MS. HARRIS:  The government received Ms. McMurray's

16  voir dire.

17          THE COURT:  Do you have any objection?

18          MS. HARRIS:  No, Your Honor.

19          MR. LUNN:  Judge, I will say that I did respond to

20  the government with relation to what I anticipated that voir

21  dire would be, and that is exactly what I just represented to

22  the court.  So it would not come as any surprise.

23          THE COURT:  Do you have objections to the

24  government's voir dire?

25          MR. LUNN:  Judge, I object to the extent that it

1   becomes more fact specific.  As long as we're asking more

2   generalized questions, I don't have a problem with the voir

3   dire.

4          THE COURT:  That's why I have you exchange voir dire

5   questions so that you can make objections and we know where

6   we're going and what the problems are going to be.

7          MR. LUNN:  Yes, and I informed the government in my

8   response relating to voir dire that I would object to questions

9   that are more -- which attempt to involve facts that relate to

10  the crime instead of -- the alleged crime itself.  I do have

11  problems with that type of voir dire.  If someone wants to ask

12  about what someone does for a job or how long they've lived in

13  Tulsa County, I certainly don't have any problems with that.

14         THE COURT:  That should all be in the questionnaires,

15  I would hope.  Ms. McMurray.

16         MS. MCMURRAY:  Judge, I would just ask for just a few

17  minutes.  We got a few last-minute --

18         THE COURT:  Well, they were available last week.  You

19  just got them at the last minute, I guess.  Picked them up.

20         MS. MCMURRAY:  The last e-mail I saw was they would

21  be delivered to us this morning.  If there was another e-mail,

22  I did miss that.

23         THE COURT:  All right.

24         MS. MCMURRAY:  Thank you.

25         THE COURT:  This is how this is going to work.  We're

1  going to bring in one half of the jurors, seat them in the

2  back.  I'll give them some preliminary statements about a

3  trial.  I'll summarize the indictment, find out if people have

4  been exposed to the facts and, if so, what their exposure is

5  and if it's a problem.  I'll give each of you 15 minutes to

6  voir dire the jury panel based on the questions you have

7  submitted.

8           We'll then excuse the jurors and take up for-cause

9  challenges and peremptory challenges.  I will give the

10  government the standard ten plus one, and I'll give the

11  defendants the standard 16, and they'll each have an additional

12  one.  So that will be 19.  Any questions or issues?

13           MS. HARRIS:  Your Honor, I have a question.

14           THE COURT:  Yes, ma'am.

15           MS. HARRIS:  We intend to, with the court's

16  permission, read our exhibit -- not our exhibit list, but our

17  witness list, so we can determine if any of the jurors might

18  know the witnesses.  The defendants have produced extensive

19  witness lists, and we would ask that those names be identified

20  as well to the jurors for the same reason.

21           THE COURT:  I normally have you each stand up and

22  introduce anyone who is assisting you at trial in this case.

23  I'll call on Ms. Duke, and she can introduce everyone who is

24  assisting her and then have them name their witnesses and

25  parties, to the extent that's applicable.

 1          Any other questions or issues we need to take up?

 2          MR. GOTCHER:  Your Honor.

 3          THE COURT:  Yes, sir.

 4          MR. GOTCHER:  May I approach the reporter and

 5  retrieve my witness list that's?  That's the only one I think I

 6  may have.  I gave her a copy pursuant to --

 7          THE COURT:  Fair enough.

 8          I'm surmising several of these are character

 9  witnesses.  I'm going to limit you to one character witness

10  apiece, and you can have others who testify if they have the

11  basis to give that opinion also testify, but this is not a

12  trial by character.  It's a trial about the acts committed that

13  are charged in the indictment.  So you may wish to make

14  revisions on that or not.  But that's where we're going with

15  that.  Ms. McMurray.

16          MS. MCMURRAY:  Yes, sir, Judge, I identified a few

17  potential jurors that I think if we could all agree, should

18  just be excused for cause.  Do you want to take that up at the

19  time, now or --

20          THE COURT:  Let's take it up when we're doing

21  for-cause challenges.  They may not be in the first group.

22          MS. MCMURRAY:  Judge, can you hear me from here?

23          THE COURT:  I can hear you.

24          MS. MCMURRAY:  Additionally, for clarification, on

25  our witness list, they're not character witnesses, but we've

1    identified five to six officers throughout the years to come in

2    and testify regarding drug distribution.  You wouldn't consider

3    those character witnesses, would you?

4              THE COURT:  Regarding the what?

5              MS. MCMURRAY:  The drug distribution counts where

6    Eric Hill and Cal Kaiser state that they planted drugs and it

7    was common knowledge among TPD.  So I've identified --

8              THE COURT:  They're going to come in and say it

9    wasn't part of their common knowledge?

10             MS. MCMURRAY:  Correct.

11             THE COURT:  I don't see how that's going to be

12   relevant.  You'd have to bring in everyone on the force.

13             MS. MCMURRAY:  That's why I've just identified a

14   few.  I could bring in everyone on the force, but I did

15   identify --

16             THE COURT:  How are the few going to prove common

17   knowledge?

18             MS. MCMURRAY:  They're going to disprove it.  They're

19   putting us in a position of proving a negative, so I'm going to

20   bring witnesses in to say they've never seen it, heard of it,

21   they worked side by side.

22             THE COURT:  That's a pretty collateral point.  I'm

23   not going to allow substantial testimony on that.  You can have

24   a few witnesses testify about that.  I would suspect several of

25   those who are going to be on the stand were officers at various

1   times.  You can ask them if they had heard about it.

2           MS. MCMURRAY:  That's exactly what --

3           THE COURT:  If you're calling them just for that

4   purpose, I think it's unlikely they are going to testify.

5           MS. MCMURRAY:  If I'm calling them just for the

6   purpose of --

7           THE COURT:  Of saying they didn't know about any drug

8   distribution.

9           MS. MCMURRAY:  Well, there's more than that, but I

10  mean, that is --

11          THE COURT:  If there's more than that, then perhaps

12  you can ask them that question when they're on the stand, but I

13  don't know how many officers there are on the police force, but

14  I assume more than a hundred.  Probably a couple hundred, if

15  you cover all the years.  We're not going to have 200 people

16  come in and testify they didn't know about it.

17          MS. MCMURRAY:  I'm not asking for that, Judge.

18          THE COURT:  All right.  Anything else?

19          MR. LUNN:  Judge, in that vein, we have an allegation

20  obviously that where we've asked for specific instances where

21  there might have been this type of drug substitution going on.

22  That hasn't been provided to us.  And so we are dealing with a

23  situation that covers four years.

24          THE COURT:  I think they just identified your client

25  was involved in some of those, and you were objecting to that.

1           MR. LUNN:  On drug distribution?

2           THE COURT:  Distribution and sale of proceeds being

3    distributed back.

4           MR. LUNN:  Judge, I don't -- well, our position would

5    be that if we're talking about those instances, for one thing,

6    there are a couple of 404(b) instances, those are not tied to

7    this specific allegation.  So those were supposedly other

8    crimes.  So they're not a part of the allegation.  So really

9    all we're left with is a time period that spans four years and

10   that is vague, that does not include any specific instance.

11          And so to the extent that there -- that their

12   allegation is so open-ended, we think it is important to be

13   able to call a number of officers to be able to refute that

14   anything of that nature was going on during specific times of

15   that four-year period that our defendants are on the streets

16   and doing things --

17          THE COURT:  Is this included in the indictment?  Is

18   this some part of the charged offenses?  What are you talking

19   about there are allegations that everyone knew?  Where is that

20   in the indictment?

21          MR. LUNN:  It's actually in some of the materials

22   that have been provided to us, either grand jury materials or

23   302 statements by the respective officers that are making that

24   allegation.

25          THE COURT:  I don't see the relevance of that, so I'm

1    inclined to limit the government's evidence on that, and yours

2    as well.  Whether everyone knew has nothing to do with the

3    specifics alleged in the indictment.

4            MR. LUNN:  Judge, our point is that the only

5    specifics there are in the indictment is that something

6    supposedly went on over a course of four years, and we're

7    having to try to rebut that, and the only way we can do that

8    effectively is --

9            THE COURT:  Well, show me in the indictment where it

10   says that.

11           MR. LUNN:  The Counts 4 and 6.  Dealing with Count 4,

12   a period of time that runs from January 2006 to December 2009,

13   and it identifies no specific incident --

14           THE COURT:  And they're going to come in and testify

15   that Mr. Wells, Mr. DeBruin and Mr. Bonham did not use their

16   positions as Tulsa police officers to plant quantities of

17   marijuana, methamphetamine and cocaine and crack?  Is that

18   going to be their testimony?

19           MR. LUNN:  During -- we've got a period --

20           THE COURT:  Or that they never heard about it?

21           MR. LUNN:  Yes, we've got a period of four years

22   where there are numerous officers who are around Officer

23   Bonham, Officer DeBruin and Officer Wells on a regular basis

24   and, yes, they've never heard about it.

25           THE COURT:  It doesn't prove they didn't do it.

1          MR. LUNN:  Well, then what are we rebutting?

2    We're --

3          THE COURT:  I guess you're rebutting -- the

4    government has to prove they did it.  To the extent they don't

5    prove it, then you have nothing to rebut and your clients are

6    not going to be found guilty on Counts 4 and 6.  If they prove

7    specifics, then you need to rebut the specifics.  But just to

8    say I've never heard about it doesn't prove anything.

9          MR. LUNN:  Well, thank you, Judge.  I will -- I guess

10   we'll deal with it as we go along in the trial.  Thank you.

11         THE COURT:  Fair enough.  Anything else?  All right.

12   Let's take a recess and bring in the prospective jury.

13         (Whereupon a recess was had.)

14         (Voir dire was conducted and is filed in a separate

15   transcript.)

16                    REPORTER'S CERTIFICATE

17   I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

18   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

19   MATTER.

20

21                         S/Terri Beeler
                           Terri Beeler, RMR,FCRR
22                         United States Court Reporter

23

24

25